## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action No. 08-01-GMS |
| | ) |
| ANTHONY J. LOFINK, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. SECTION 5K2.13

### I.    Procedural History

On January 8, 2008, the United States filed a three-count felony Information charging defendant, Anthony Lofink ("Defendant" or "Lofink") with conspiracy to commit wire fraud; conspiracy to commit money laundering; and wire fraud.  Defendant pled guilty to the felony Information on February 5, 2008.  Sentencing is scheduled for July 2, 2008, at 10:15 a.m.

Pursuant to a Presentence Investigative Report ("PSR") prepared by the United States Probation Office/Pretrial Services Agency ("USPO"), Defendant was assigned a base offense level of 23.  Defendant received two sentencing enhancements: one for his role as an organizer, leader, manager or supervisor of the fraud pursuant to U.S.S.G. § 3B1.1(c); and a second two-level increase for abusing a position of trust under U.S.S.G. § 3B1.3.  After a three-level reduction for his acceptance of responsibility, Defendant was assigned a total offense level of 26 and a guideline range of 63-78 months.

Defendant's Sentencing Memorandum in Support of his Motion for Downward Departure Pursuant to U.S.S.G. § 5K2.13 ("Defendant's Sentencing Memorandum") seeks a departure based on a claim of diminished capacity; challenges the USPO's determination that a two-level enhancement for abusing a position of trust is appropriate under the circumstances of this case; and, seeks a variance from the advisory guideline range based on the sentencing factors set forth in 18 U.S.C. §3553(a). This is the Government's response.

## II.    Factual Summary[1]

### A.    Defendant's Personal History

Defendant is thirty years old and a lifelong resident of the State of Delaware. He is the third of four children born to Donna and Vincent Lofink. Defendant's parents had a troubled marriage, divorcing when he was in college. As a child, Defendant was subjected to certain abusive treatment, although medical treatment was never required for any physical injuries he sustained. Defendant attended Catholic schools, graduating from Salesianum, an all boys college preparatory school, and earned a baseball scholarship to the University of Delaware. After transferring to Wilmington College, Lofink earned a Bachelor of Sciences Degree in Criminal Justice in 2001 and a Masters Degree in Human Resource Management in 2005.

Defendant began abusing alcohol at age eighteen and started using cocaine at the age of twenty-four. During conversations with his medical experts in November, 2007, Lofink described the "rush" he experienced when he used cocaine, stating that "In the past five years his use of cocaine and alcohol has escalated exponentially, leading to addiction, worsening of

---

[1] The facts referenced herein are drawn from the PSR and the information provided by Defendant to his medical experts. They are not in dispute.

depression, job difficulties and job loss, and repeated alcohol/drug treatment". See Exhibit A to Defendant's Sentencing Memorandum at 3.

Lofink was diagnosed and treated for Attention Deficit/Hyperactivity Disorder ("ADHD") in college. Lofink met with Dr. James M. Walsh, Ph.D., on two occasions for a total of four hours in November 2007. Dr. Walsh diagnosed Lofink as suffering from ADHD, Dysthymic Disorder, Alcohol and Cocaine Dependence with Physiological Dependence and Adult Antisocial Behavior.[2] Dr. John S. O'Brien II, M.D., J.D., performed a psychiatric evaluation of Defendant on March 5, 2008. Unlike Dr. Walsh, Dr. O'Brien only diagnosed Defendant with Alcohol and Cocaine Abuse and Dependence by History, and concluded that Lofink "was suffering from alcohol and cocaine abuse and related behavioral problems which served as the underpinning to, and the driving force behind, his behaviors in connection with this offense."[3]  See Exhibit B to Defendant's Sentencing Memorandum at 6.

**B.    Offense Conduct**

From July 2001 to January 2004, Lofink worked as an account specialist for MBNA, earning approximately $70,000 a year. Lofink was fired by MBNA after testing positive for cocaine. Later in 2004, Lofink was hired as a claims processor for the Delaware Bureau of Unclaimed Property ("Bureau").

The State of Delaware requires certain holders of unclaimed property to transfer that property to the State. Upon receipt, the money is deposited in the State's general fund and used

---

[2]  Dr. Walsh's report is dated December 5, 2007, and is attached as Exhibit A to Defendant's Sentencing Memorandum.

[3]  Dr. O'Brien's report is dated April 11, 2008, and is attached as Exhibit B to Defendant's Sentencing Memorandum.

as the State sees fit. Owners of unclaimed property can come forward at any time and lay claim to property held by the State.

The Bureau oversees the transfer of unclaimed property from holders to the State. It also handles claims by owners seeking the return of their property. As a claims processor at the Bureau, Lofink was the key point of contact for holders of unclaimed property and owners seeking the return of property. Lofink primarily determined what documents were needed to establish an owner's claim to property. While Lofink had authority to approve claims up to $1,000, larger claims went through two additional levels of supervisory review. Because Lofink's supervisors trusted him to do his job properly, their review of the claims and supporting documents prepared by Lofink was limited.

From May 2005, through October 2007, Lofink created ten false claims indicating that various co-conspirators were entitled to unclaimed property. As a State employee familiar with the Bureau's claims process, Lofink was the architect and critical participant in the fraud. He devised the scheme, recruited three of the four co-conspirators, decided what name should be used on the claim form, the timing of the claims, the amounts of the claims and the best way to shepherd the claims through the Bureau. As to each claim, the overall methodology was the same. Identification documents and a claim form were provided by the co-conspirator. Lofink prepared a false Time Warner letter indicating that the co-conspirator (or his benefactor) had owned stock in a Time Warner predecessor. Lofink assembled the claim documents and submitted them for approval. Once approved, Lofink distributed checks to his co-conspirators and then split the proceeds. Lofink and his co-conspirators would then structure their financial transactions so as to avoid detection of the fraud.

4

False claims were submitted for the benefit of Lofink and his co-conspirators on or about the dates and in the amounts listed below:

| DATE | CLAIMANT | AMOUNT |
| --- | --- | --- |
| May 2005 | Michael Smith | $24,014.07 |
| October 2005 | Jemain Davis | $30,033.64 |
| June 9, 2006 | Stephano Roussos | $42,101.00 |
| July 25, 2006 | Stephano Roussos | $72,126.81 |
| September 27, 2006 | Stephano Roussos | $182,151.23 |
| February 21, 2007 | Stephano Roussos | $282,163.20 |
| March 28, 2007 | Chandra Sanassie | $195,282.12 |
| June 4, 2007 | Chandra Sanassie | $222,124.23 |
| July 25, 2007 | Jemain Davis | $195,251.23 |

The scheme to defraud continued for two and one-half years and was only discovered when the Bureau received an anonymous tip that specifically identified a prior false claimant by name. At the time of this discovery, Lofink was in the process of preparing a tenth false claim in the amount of $351,370.59 on behalf of Stephano Roussos.

Shortly after a search warrant was executed at his residence, Lofink met with the government. A second meeting took place approximately two months later. During the course of these meetings, Lofink truthfully answered all questions, corroborating documented information the government had received and would subsequently receive from the Bureau and the various banks with whom Lofink and his co-conspirators did business. Lofink also identified Michael Smith as the person who had assisted him in submitting the initial false claim in the

amount of $24,000, information the government would not otherwise have discovered through a review of the Bureau's files.

**III.**    **Argument**

The Third Circuit has required that post-<u>Booker</u>, a district court must follow a "three-step sentencing process." First, the district court must "calculate a defendant's Guidelines sentence precisely as [it] would have before <u>Booker</u>." <u>See</u> <u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir. 2006) (internal quotation marks and citations omitted). Second, the court must "formally rule on the motions of both parties and state on the record whether [it is] granting a departure and how that departure affects the Guidelines calculation, and take into account [the Third] Circuit's pre-<u>Booker</u> case law, which continues to have advisory force." <u>Id.</u> Third, the court must exercise its "discretion by considering the relevant [18 U.S.C.] § 3553(a) factors" in setting the sentence it deems appropriate, even if that sentence varies from the sentence calculated under the Guidelines. <u>Id.</u> The Third Circuit has made clear that this three-step sentencing process remains in force after the Supreme Court's recent decision in <u>Gall v. United States</u>, 128 S.Ct. 586 (2007). <u>See</u> <u>United States v. Wise</u>, 515 F.3d 207, 216 (2008).

In this case, Defendant advances arguments within each stage of the three-step sentencing process: challenging the Guideline calculation and specifically the USPO's decision to impose a two-level enhancement for abuse of trust; requesting a downward departure based on diminished capacity; and, seeking a variance from the Guideline range under 18 U.S.C. § 3553(a). For the reasons that follow, the Government submits that Defendant's arguments are without merit.

A.    **The USPO Correctly Determined That The Two-Level Enhancement For Defendant's Abuse of a Position of Trust Is Warranted.**

Defendant argues that Lofink's low level position at the Bureau, the fact that he was supervised by others, and the process through which claims were approved militates against a two-level enhancement for abuse of a position of trust. The Government disagrees.

Section 3B1.3 of the Sentencing Guidelines states in pertinent part:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by two levels.

Courts have applied a two-part analysis in evaluating this section, first determining whether a position of trust existed and then considering whether that position of trust was abused. United States v. Thomas, 315 F.3d 190, 204 (3d Cir. 2002); United States v. Iannone, 184 F.3d 214, 223 (3d Cir. 1999). "[I]n determining whether a defendant occupies a 'position of trust,' a court 'must look beyond the descriptive labels to the actual *nature* of the relationship and the responsibility the defendant is given'". Iannone, 184 F.3d at 223, citing United States v. Boyle, 10 F.3d 485, 489 (7th Cir. 1993). The following factors are considered in the determination of whether a position of trust exists: (1) did the defendant's position make the wrongful conduct difficult to detect; (2) the amount of authority granted to the defendant through the position; (3) whether there was reliance on the integrity of the defendant. Thomas, 315 F.3d at 204; Iannone, 184 F.3d at 223.

Application of these factors under the circumstances of this case requires a finding that Defendant occupied a position of trust. While Lofink was only a claims processor whose formal approval authority was capped at claims under $1,000, Iannone teaches that it is not the

7

"descriptive labels" that govern, but the "actual nature of the relationship and the responsibility the defendant is given". See Thomas, 315 F.2d 190, 204-206 (caretaker/home health aide abused a position of trust when the victim relied on the defendant's integrity, and the defendant enjoyed considerable discretion and was not supervised); United States v. Craddock, 993 F.2d 338 (3d Cir. 1993) (Western Union teller with authority to verify the identities of persons requesting payouts abused a position of trust where the defendant exploited the authority provided by the position and engaged in a scheme that was difficult to detect); United States v. Hernandez, 231 F.2d 1087, 1090-1091 (7th Cir. 2000) (staff accountant with limited authority abused a position of trust where the defendant had access/authority over valuable property and his supervisors merely rubber stamped their approvals). Lofink's actual role in the preparation, consideration and approval of claims demonstrates that he had substantial discretion and significant *de facto* authority.

The Bureau administers claims to funds escheated to the State of Delaware – public funds. As a claims processor, defendant was the Bureau's primary contact with all holders of abandoned property and claimants to such property. He engaged in most of the communications with these parties and usually decided what documents were required to support a claim. Lofink handled all the documentation and prepared the files for review and approval. Checks issued by the Office of the State Treasurer for approved claims were returned to and distributed by Lofink. As such, he was clearly the key point of contact for all participants in the claims process.

Defendant's superiors stated that they personally liked and trusted Lofink. They never questioned his integrity. Consequently, review of the claims he recommended for approval was extremely limited. There was no independent, critical examination of the claim files by Lofink's

8

superiors at the Bureau.  If reviewed, documents were only checked in a very cursory way.

Moreover, the key document in the execution of Defendant's scheme was the false Time Warner

letters created by Defendant.  Because Defendant knew that his superiors accepted these letters as

adequate proof of ownership for "unknown" owner claims, the documentation supporting the

claims appeared legitimate and made the fraud more difficult to discover.

    The difficulty in detecting this fraud is further evidenced by the fact that the fraud

persisted for two and one half years in the face of an internal investigation by the Bureau.  In fact,

the fraud was only uncovered when a tipster specifically identified one of the fraudulent

claimants by name.

    The above facts demonstrate that the fraudulent scheme executed by Lofink was difficult

to uncover; his position as a claims processor gave him substantial *de facto* authority over the

claims approval process; and his superiors relied on his integrity in their limited consideration of

claims. As such, Lofink occupied a position of public trust and he abused that trust when he stole

State funds.

    **B.**    **Defendant's Request for Downward Departure Pursuant to Section 5K2.13 Must Be Denied for Two Reasons.  Initially, Defendant Has Failed to Prove That He Suffered From a Significantly Reduced Mental Capacity and That This Incapacity Contributed Substantially to His Fraud; In the Alternative, Defendant's Request Is Barred By His Voluntary Use of Alcohol and Cocaine.**

    Under U.S.S.G. § 5K2.13 the Court may, in its discretion, grant a downward departure if

(1) the defendant committed the offense while suffering from a significantly reduced mental

capacity; and (2) the significantly reduced mental capacity contributed substantially to the

offense. U.S.S.G. § 5K2.13.  Defendant bears the burden of establishing each of the above

criteria by a preponderance of the evidence. <u>United States v. McDowell</u>, 888 F.2d 285, 291 (3d

Cir. 1989). The defendant must also show that his incapacity is exceptional or sufficient to place

him outside the heartland of similar cases. <u>Id</u>. <u>Koon v. United States</u>, 518 U.S. 81, 95, 96

(1996).

A defendant suffers from a "significantly reduced mental capacity" when he has a

"significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the

offense or to exercise the power of reason; or (B) control behavior that the defendant knows is

wrongful." U.S.S.G. § 5K2.13, Application Note 1; <u>see also</u> <u>United States v. McBroom</u>, 124

F.3d 533, 548 (3d Cir. 1997). A mere "reduction" in mental capacity is not sufficient to meet the

Defendant's burden. Instead, the Defendant must prove that his reduced mental capacity was

"significant." <u>McBroom</u>, 124 F.3d at 548. Moreover, the Defendant must prove that the alleged

diminished capacity contributed to the commission of the offense, that is, there must be a causal

link. <u>Id</u>. The Court may exercise its discretion and deny the departure even if the Defendant

satisfies his burden of proof. <u>See</u> <u>id</u>.

Finally, the Guidelines specifically provide that "the Court may not depart below the

applicable Guideline range if the significantly reduced mental capacity was caused by the

voluntary use of drugs or other intoxicants." U.S.S.G. § 5K2.13.

> **1. Because Defendant Has Failed to Prove That At the Time He Committed the Fraud He Was Suffering From a Significantly Reduced Mental Capacity and His Incapacity Contributed Substantially to the Offense, His Request For a Departure Under 5K2.13 Must Be Denied.**

As stated above, to sustain his burden of proof, Defendant must establish that at the time

he committed the fraud he was suffering from a significantly reduced mental capacity *and* the

significantly reduced mental capacity contributed substantially to the offense. U.S.S.G. § 5K2.13.
Defendant fails on both counts.

Defendant appears to argue that he suffered from a "substantially reduced mental
capacity" in that he could not control his wrongful behavior.  See Defendant's Sentencing
Memorandum at 18-19.  Claiming that he was sober through "most of his [offense] conduct",
Defendant contends that he became a "dry drunk" chasing the rush he had previously experienced
when using alcohol and drugs.  Id.  In this regard, Defendant relies on the opinion of Dr. Walsh,
who observed:

> In a way one could conceptualize his financial criminality as a form of
> Pathological Gambling, which is another addictive behavior and one which the
> literature is showing to be a strongly related, physiologically, to the neurological
> mechanisms associated with addiction in general and Cocaine Dependence in
> particular.  In a sense Mr. Lofink simply replaced his Cocaine Dependence with
> another stimulus for the "rush" experience, his misappropriation of state funds.

Dr. Walsh specifically concludes, however, that a diagnosis of "pathological gambling" was not
appropriate due to the "infrequency with which Mr. Lofink gambles".  See Exhibit A to
Defendant's Sentencing Memorandum at 6.  Nowhere in his report does Dr. Walsh offer the
opinion that Defendant was unable to control behavior he knew was wrongful.  Instead, he
merely observes that Defendant "suffers from the inability to manage his impulsiveness, as
reflected in generally poor self-discipline, high capacity to tolerate risk, and a diminished
capacity for deliberation, especially in stressful situations."  This behavior is not the type of
exceptional incapacity cognizable under 5K2.13, and is not so different from the behavior
exhibited by many other defendants who come before this Court.

Importantly, Dr. Walsh's opinions are not shared by Defendant's second expert, Dr. O'Brien. Dr. O'Brien, who had the benefit of reviewing Dr. Walsh's report at the time he prepared his findings, concludes only that Defendant suffers from Alcohol and Cocaine Abuse and Dependency by History and the residual effects of childhood abuse. Nowhere in his report does Dr. O'Brien opine that Defendant was unable to control behavior he knew to be wrongful.

Moreover, Defendant's criminal conduct demonstrates some degree of planning, discipline and an ability to control his behavior. Defendant maintained his employment throughout his criminal conduct, interacting daily with those he sought to deceive. He submitted nine false claims (and was preparing a tenth) over the course of two and one-half years. Defendant was sensitive to the timing of the submission of these claims. He decided what names should be used and for how long a particular name could be used without drawing suspicion. He and his co-conspirators managed to structure their financial transactions and spend the proceeds of the fraud in a way that avoided detection. Defendant's actions over this extended period of time demonstrate an ability to control his behavior.

Defendant also fails to prove that the incapacity from which he suffered contributed substantially to his offense. To the contrary, Dr. O'Brien concludes that Defendant's criminal conduct was largely the product of his alcohol and cocaine abuse. In addition, the facts demonstrate that financial motives played a substantial part in Defendant's actions. Defendant was making approximately $30,000 per year during his tenure with the Bureau, a fraction of what he previously earned at MBNA. PSR at ¶ 81. Defendant had a substantial cocaine habit and was in debt. He had become intimately familiar with the claims process at the Bureau and saw an opportunity. Initially, his intention was to submit one false claim in order to extricate himself

12

from debt.  However, Defendant became enamored with the money and the lifestyle it afforded him.  PSR at ¶ 34.

Because Defendant's drug abuse and greed were primary causes of the theft, he has failed to establish the causation element required under U.S.S.G. § 5K2.13 and his departure request must be denied.

> **2.    Defendant's Request For a Downward Departure Based On Diminished Capacity Is Barred By Defendant's Voluntary Use of Alcohol and Cocaine.**

When a defendant's use of alcohol and/or cocaine causes the significantly reduced mental capacity, he cannot avail himself of the diminished capacity departure.  The defense recognizes this fact, noting that Lofink's "alcohol and cocaine addiction seemingly bars him from receiving a downward departure based on diminished capacity under U.S.S.G. § 5K2.13." See Defendant's Sentencing Memorandum at 15, n.4.  However, in an effort to circumvent this proscription, Defendant points to Dr. Walsh's observation that "[m]ost of Mr. Lofink's illegal actions occurred during his ten-month period of abstinence from alcohol and cocaine," theorizing that Defendant's criminal conduct may have been influenced by his psychological problems, not his substance abuse.  Id.  Defendant's position, however, is contradicted by the facts and Dr. O'Brien's conclusions.

Defendant's fraudulent scheme lasted for 30 months, beginning sometime prior to May 2005 when Defendant's plan was hatched and the first false claim submitted, and continuing until his termination by the Bureau in October 2007, when Defendant's preparation of a tenth false claim was foiled.  Contrary to Defendant's and Dr. Walsh's observations, Defendant was abusing alcohol, powder and crack cocaine, and ecstacy for 20 of the 30 months at issue.  See

13

PSR at ¶ 72. Defendant was abusing these substances when he devised the scheme and submitted the first two false claims for approximately $54,000 in 2005; and Defendant was abusing these substances when he prepared an additional five false claims for approximately $1.24 million in 2007. Consequently, Defendant's alcohol and substance abuse was not a secondary cause of Defendant's illegal conduct. This view is supported by Defendant's own expert, Dr. O'Brien, who diagnosed Defendant as suffering from Alcohol and Cocaine Abuse and Dependency by History. O'Brien goes on to state that, "It is my opinion that during the time period that the offenses took place, Mr. Lofink was suffering from alcohol and cocaine abuse and related behavioral problems which served as the underpinning to, and the driving force behind, his behaviors in connection with the offense." See Exhibit B to Defendant's Sentencing Memorandum at 6.

Because Defendant's significantly reduced mental capacity was the product of his alcohol and cocaine abuse, Defendant's request for a departure based on diminished capacity must be denied.

**C.      Application of the Sentencing Factors Under 18 U.S.C. § 3553(a) Requires a Sentence At the Low End of the Guideline Range.**

18 U.S.C. § 3553(a) requires consideration of the following factors in the Court's sentencing determination:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed;

(3) The kinds of sentences available;

14

(4) The kinds of sentence and the sentencing range established by the Guidelines;

(5) Any pertinent policy statement issued by the Sentencing Commission;

(6) The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) The need to provide restitution to any victims of the offense.

The sentence imposed should reflect the seriousness of the offense, promote respect for the law, and provide just punishment; deter criminal conduct generally; deter the defendant from committing further crimes; and provide the defendant with needed training, medical care or other correctional treatment. 18 U.S.C. § 3553(a)(2). The government submits that application of 3553(a) factors in the context of this case calls for a sentence at the low end of the Guideline range.

## 1.   The Nature and Circumstances of the Offense.

Defendant's crimes were serious in many respects. Defendant, as a state employee entrusted with processing false claims to unclaimed property, used his position to steal approximately $1.24 million and violate the public trust. Using his knowledge of the claims process, Defendant devised a scheme to defraud and deceived his superiors for 30 months. He recruited co-conspirators who were necessary participants in his false claims scheme. He and his cohorts then structured their financial transactions to avoid detection of their criminal activity. And, finally, Defendant facilitated a fraud upon the Small Business Loan Source, LLC by providing documentation that enabled one of his co-conspirators to fraudulently secure a loan so that the two could pursue a tanning salon franchise opportunity. These facts call for a sentence

15

that exacts a severe punishment for Defendant's criminal conduct and deters others from abusing the public trust.

### 2.    Defendant's History and Characteristics.

Defendant's history and characteristics must also be considered. Defendant has a limited criminal history. He has consistently expressed remorse for his actions. He suffered a childhood trauma, which appears to have contributed to certain personality disorders and a serious dependence on alcohol and cocaine as an adult.

However, unlike many of the other defendants who come before this Court, Defendant has also enjoyed his share of privileges and opportunities. Defendant attended private schools. Through his athletic prowess, he secured a college scholarship. He graduated from college with Bachelors and Masters degrees. Upon graduation, Defendant secured jobs at MBNA and then the Bureau. While Defendant has struggled with alcohol and cocaine, he has also benefitted from the support of those who encouraged him repeatedly to seek treatment. In sum, Defendant has enjoyed benefits that are denied to many other defendants – some degree of family structure, a good education, employment opportunities and people who care about him. He has squandered these opportunities and now must answer for his conduct.

### 3.    Defendant's Cooperation.

Defendant deserves consideration for his cooperation with authorities. He met with the Government on two occasions. He truthfully answered questions about his participation in the fraud and the participation of his co-conspirators. Because of the nature of Defendant's fraudulent scheme, bank records and Bureau files clearly documented Defendant's participation in the fraud. However, Defendant's statements corroborated the documentation and provided

some context to these records. He told authorities about the initial false claim for $24,000

involving Michael Smith, which was not otherwise documented in the Bureau files. Finally,

Defendant met with authorities early in the investigation, at a time when authorities were trying

to assess the scope of the fraud and the damage caused. Defendant's description of his activities

provided investigators with some degree of comfort that the fraud at the Bureau was limited.

### 4.    Avoiding Unwarranted Sentencing Disparities.

Relying on 3553(a)(6), Defendant argues that a sentencing variance is necessary "to avoid

unwanted sentencing disparities among similarly situated defendants who have committed fraud

related offenses." See Defendant's Sentencing Memorandum at 22. In support, Defendant cites

to the following three cases: United States v. Howe, No. 04-85-GMS (3d Cir. argued June 3,

2008); United States v. Andrew Yao, No. 06-27-GMS, appeal docketed, No. 08-1977 (3d Cir.

2008); United States v. Levinson, No. 06-62-SLR (3d Cir. Argued June 4, 2008). Examination

and comparison of those cases to this case demonstrates that the defendants are not similarly

situated.

In Howe, defendant was convicted of defrauding the United States Air Force of $152,850,

which was repaid by a third party prior to sentencing. The Guidelines range was 18-24 months

and the United States recommended a sentence of 18 months. In imposing a sentence of

probation, this Court focused on the isolated nature of defendant's mistake; defendant's twenty

years of service in the United States military; the absence of any prior criminal record or

substance abuse; and the defendant's extensive service to his church and community. See

pertinent pages of the Sentencing Transcript in Howe, attached as Exhibit A.

17

In Yao, defendant was convicted of two counts of making a false oath in relation to a bankruptcy proceeding. At the time of sentencing, 12 additional counts involving false statements, wire fraud, and money laundering were pending in the Eastern District of Pennsylvania. This Court determined that the defendant's conduct, as charged by the Government, more closely aligned with perjury than fraud. As a result, the applicable Guideline range was 15-21 months and the Court imposed a sentence of twelve months and one day.

Levinson, a manager and part owner of CoolerSmart, LLC pled guilty to defrauding CoolerSmart's parent company by falsifying reports of financial performance and filing a false income tax return. Prior to sentencing, Levinson settled a civil suit with CoolerSmart's parent company for $350,000. In addition, the parties stipulated to a loss figure of $177,289 for sentencing purposes, which represented the amount of money defendant took from the company for his own benefit. The applicable Guideline range was 24-30 months and the Court imposed a sentence of two years probation, with the condition of six months home confinement.

As part of her sentencing comments, the Court noted that defendant's "victim was a private business entity who[se] principals have resolved their dispute for a sum of money," that "Mr. Levinson did not harm the public from a financial point of view," and that his "crimes had little impact beyond his business partners and his family." The Court made specific mention of the fact that Levinson was not "a public official who abused his position of trust." See pertinent pages of the Sentencing Transcript in Levinson, attached as Exhibit B.

Lofink's conduct and his personal characteristics are very different from the defendants discussed above. Lofink clearly lacks the personal attributes this Court found so persuasive in Howe. In addition, Lofink's offense conduct is far more serious. The amount of loss attributable

18

to Defendant is staggering. He returned only a fraction of the money he stole, having squandered the theft proceeds on drugs and frivolous purchases. As a state employee, he stole public funds. His conduct was not an isolated mistake, and instead consisted of nine false claims, money laundering and the fraud on Small Business Loan Source, LLC. Justice demands a harsh penalty. Crediting Defendant for his cooperation, the Government recommends a sentence at the low end of the Guidelines range.

**IV.    Conclusion**

For the reasons set forth above, the United States respectfully requests that this Court (1) affirm the Guideline calculation by the USPO; (2) deny Defendant's request for a departure under U.S.S.G. § 5K2.13; and (3) deny Defendant's request for a variance and impose a sentence at the low end of the Guideline range.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY: _____
David C. Weiss
First Assistant United States Attorney

DATED:   June 24, 2008

19

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

UNITED STATES OF AMERICA,     :     Criminal Action

            :

        Plaintiff,     :

            :

    v.          :

            :

MALCOLM G. HOWE,       :

            :

        Defendant.     :     No. 04-85-GMS

- - -

Wilmington, Delaware
Tuesday, December 12, 2006
10:00 a.m.

- - -

BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

APPEARANCES:

        DAVID L. HALL, ESQ., and
        CHRISTOPHER J. BURKE, ESQ.
        Assistant United States Attorneys

                   Counsel for Government

        KATHLEEN JENNINGS, ESQ.
        Oberly Jennings & Rhodunda, P.A.

                   Counsel for Defendant

1    statements changed.  But enough of that issue.  I think the

2    Court is well-aware of what happened.

3            With respect to acceptance of responsibility,

4    Malcolm Howe is acknowledging responsibility.  I didn't hear

5    any equivocation on his part.  He is saying, he is here

6    because of what he did.  And he is absolutely accepting the

7    judgment of this Court because of his own action.  That

8    couldn't be more clear based upon what he has told the Court

9    today.

10           That is important, because he could stand here

11   and indicate that, no, you know, the jury was wrong, the

12   jury somehow got it wrong.  That's not what he is saying.

13   That's not what he is saying.

14           It is important in this system to understand

15   that redemption in the eyes of the law is what we are all

16   hoping for.  That's the best we can hope for, that someone

17   says, I really did wrong here, I committed an act for which

18   I deserve to be sentenced, and I am the reason my family is

19   suffering and I am the reason that the Air Force and the

20   government had to do what they did.

21           That's what he is saying to the Court, nothing

22   else.

23           THE COURT:  Thank you, Ms. Jennings.

24           I have heard equivocation from that podium on

25   many occasions throughout the almost nine years that I have

1    been doing this, in countless sentencings over which I have

2    presided.   That was not equivocation on the issue of

3    acceptance of responsibility that I heard from this

4    gentleman.

5                Ms. Jennings, you may step forward with your

6    client.

7                MS. JENNINGS:   Thank you, Your Honor.

8                THE COURT:   Having been convicted of Counts 1

9    and 2 of the indictment, charging Mr. Howe with having

10   violated Title 18, Section 1343 of the United States Code,

11   it is the obligation of this Court to pronounce sentence.

12   And I will do so forthwith.

13               Pursuant to the Sentencing Reform Act of 1984,

14   it is the judgment of the Court that Malcolm G. Howe is

15   hereby placed on probation for a term of two years on each

16   of Counts 1 and 2, to be served concurrently.   The Court has

17   considered all of the factors contained in Title 18 of

18   United States Code, Section 3553(a), including the

19   Sentencing Guidelines, and finds this sentence reasonable

20   and appropriate.

21               While on probation, Mr. Howe shall not commit

22   another federal, state, or local crime, and shall comply

23   with the standard conditions that have been adopted by this

24   Court, and shall comply with the following additional

25   conditions.

1          You shall not illegally possess a controlled

2    substance.

3          You shall not possess a firearm, ammunition, or

4    destructive device of any kind.

5          You shall cooperate in the collection of DNA as

6    directed by your probation officer.

7          You shall perform 100 hours of community service

8    as directed by your Probation Officer.

9          You shall be placed on home confinement for a

10   period of three months, to commence immediately.  During

11   this time you shall remain at your place of residence at all

12   times and shall not leave except when such leave is approved

13   in advance by your probation officer.  You shall maintain a

14   telephone at your place of residence without any

15   call-forwarding option, caller ID, or call-waiting, modems,

16   answering machines, cordless telephones or other special

17   devices for the above period of time.  That is the

18   three-month period of time.  You shall wear an electronic

19   device and shall observe the rules specified by the U.S.

20   Probation Office.

21          You shall pay the cost of the electronic

22   monitoring portion of this sentence not to exceed the daily

23   contractual rate.  Payment for the electronic monitoring

24   shall be made in accordance with the Probation Officer's

25   directions.  Changes to the established rate can be made by

1    the Probation Officer subject to supervisory approval.

2            In addition, you shall comply with the following

3    three additional conditions.

4            You shall provide your probation officer with

5    access to any requested financial information.

6            You shall not incur any new credit charges or

7    open any additional lines of credit without consultation or

8    approval by your Probation Office.

9            Periodic drug testing mandated by the Violent

10   Crime Control and Law Enforcement Act of 1994 is hereby

11   suspended.  The Court finds that this offense is not

12   drug-related and this defendant has no current or past

13   history of drug abuse.

14           The Court finds that the defendant does not have

15   the ability to pay a fine.  The Court will thus waive a fine

16   in this case.

17           It is further ordered, Mr. Howe, that you shall

18   pay to the United States a special assessment of $200, which

19   is due immediately.

20           Mr. Howe, after having considered the provisions

21   of the United States Sentencing Guidelines, the advisory

22   Guideline range, the Supreme Court's ruling in United States

23   versus Booker, the sentencing factors outlined in Title 18,

24   Section 3553(a), and the underlying goals of sentencing,

25   most of which have been mentioned by you and your counsel

 1    and AUSA Hall, including punishment, deterrence,

 2    rehabilitation, respect for the law, I am sentencing you to

 3    probation.   This sentence reflects the Court's view that,

 4    under the totality of the circumstances involved, a sentence

 5    of probation rather than a period of incarceration better

 6    serves the interests of justice, as that term is applied to

 7    the societal interest in sentencing reflected in Section

 8    3553(a) and the various rulings of our Supreme Court and

 9    various courts of appeals.

10          The Court feels this sentence is appropriate for

11    several reasons.

12          First, Mr. Howe, the Court recognizes that this

13    is an isolated mistake, by all accounts, albeit an

14    extraordinarily serious one.  Mr. Hall has not overreached

15    at all in his description of the nature of the offense and

16    the calculated nature of the offense, and the taking

17    advantage of special knowledge that you possessed and to

18    which you came to possess during the course of your service.

19          But by all accounts you have led an honorable

20    and lawful life until this point, as attested by the many,

21    more than 40 character letters that I received and read.

22          You have no prior criminal history, nor any

23    history of substance abuse of any kind, as best I can tell.

24    You have served in the U.S. Military for 20 years and were

25    honorably discharged with the rank of Master Sergeant.

1          Further, you are a well-regarded member of your

2     community.  This is further evidenced by the many letters,

3     many, many letters from non-relatives, people whom you

4     served, high-ranking officers and others, members of the

5     clergy, and just regular folks who wrote on your behalf.

6          You regularly attend church and participate in

7     church activities.

8          The Court also understands that running your own

9     business is difficult and can produce financial hardships.

10    But this is in no way an excuse or to minimize, again, the

11    seriousness of your acts.  However, the Court believes you

12    recognize the seriousness nature of the offense and are

13    truly remorseful, as I think was well-evidenced by your

14    statement, which I felt, quite frankly, was heartfelt today.

15    This is also demonstrated by the fact that you immediately

16    closed your business and seemed to be honestly committed to

17    exploring new opportunities to provide for your family in a

18    manner which, quite frankly, I think over the years has been

19    quite extraordinary, quite extraordinary, your immediate

20    family and your extended family, and those who were not

21    blood relations.

22         It should be noted that you are a devoted

23    husband, father, and son.

24         The Court recognizes that this process has been

25    difficult for your family, and is encouraged by the support

1    that it saw in the letters and sees today out in the well of

2    the court by virtue of the attendance of many individuals

3    whom I think I assume rightly are connected with you in some

4    way.  The Court hopes you will remember this experience so

5    if you are again faced with a decision of this sort, the one

6    that brings you before me today, that you will in the future

7    choose more wisely.

8                    I wish you good luck.

9                    Counsel, do either of you know of any reason

10   other than those already stated why sentence should not be

11   imposed as read?

12                    MS. JENNINGS:  No, Your Honor.  Thank you.

13                    MR. HALL:  No, Your Honor.

14                    THE DEFENDANT:  Thank you, Your Honor.

15                    THE COURT:  I thought Mr. Hall was saying

16   something else.

17                    MR. HALL:  Except to ask that we adjourn for the

18   forfeiture matter.  As to the sentence that's been imposed

19   so far, there is no objection.

20                    THE COURT:  So I am going to, with the assent of

21   counsel, I think, at this point, as suggested by the

22   government, not advise Mr. Howe of his appeal rights at this

23   time, and suspend that for the time when the Court finally

24   enters judgment.

25                    Counsel, what I would like to get from you,

# Exhibit B

1

<pre>
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -

4    UNITED STATES OF AMERICA,        :      CRIMINAL ACTION

5              Plaintiff              :

6         vs.                         :

7    ADAM LEVINSON,                   :

8              Defendant              :      NO. 06-62 (SLR)

9                                  - - -

10                                Wilmington, Delaware
                                  Monday, February 12, 2007
11                                4:42 o'clock, p.m.

12                                 - - -

13   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

14                                 - --

15   APPEARANCES:

16            SHANNON THEE HANSON, ESQ.,
              Assistant United States Attorney
17
                   Counsel for Plaintiff
18

19            THE LYONS LAW FIRM
              BY:  EDMOND D. LYONS, JR., ESQ.
20
                   Counsel for Defendant
21
                                   - - -
22

23                                Valerie J. Gunning
                                  Official Court Reporter
24

25
</pre>

1      THE COURT:  I certainly have listened

2   carefully to all the remarks made here in the courtroom

3   and have read all the letters that have been submitted on

4   Mr. Levinson's behalf.  In determining the appropriate

5   sentence for a defendant, it is my responsibility to

6   consider the advisory sentencing guideline range, in

7   this case, a range of 24 to 30 months of imprisonment,

8   as well as consider the factors set forth in Title 18 of

9   the United States Code, Section 3553(a), including the

10  nature and circumstances of the offenses, the history and

11  characteristics of the defendant, the need to promote

12  respect for the law, to afford adequate deterrence to

13  others, to protect the public from further crimes of

14  this defendant, and to provide just punishment for the

15  offenses.

16      In terms of the nature and circumstances of

17  the offenses, it is apparent from the record -- and this

18  is consistent with the representations by Ms. Hanson --

19  that Mr. Levinson did engage in a detailed, extensive and

20  thorough effort to conceal from Elkay Corporation, the

21  parent company to Mr. Levinson's business, CoolerSmart,

22  numerous fraudulent misrepresentations regarding

23  CoolerSmart's performance for more than two years.  In

24  order to convince Elkay that CoolerSmart was operating

25  successfully, Mr. Levinson manipulated sales reports and

1   falsified financial information.  He hired temporary

2   employees to create a false set of books and sanctioned

3   CoolerSmart employees who would not help him in his

4   fraudulent scheme.  He shredded documents and deleted

5   electronic data.  He did such a good job, in fact, of

6   covering up his fraudulent activities that Elkay did not

7   discover them through its routine audits.  Only through an

8   anonymous tip was defendant's conduct finally disclosed.

9          It's also apparent from the record that Mr.

10  Levinson engaged in this complex course of conduct not

11  just to keep his job and his company going, he used over

12  $175,000 of the ill-gotten proceeds to lease a luxury car

13  for his personal use, to travel to the beach, to Florida,

14  to Italy, to join a country club and, in general, to pay

15  for personal expenses with unauthorized company money.

16          With respect to Mr. Levinson's history and his

17  characteristics, by all accounts, he is engaging, energetic

18  and productive, as a member of the community and as a

19  family member and friend.  Likewise, the criminal activity

20  which brings us to court today necessarily demanded these

21  same characteristics.

22          Mr. Levinson has reported a difficult

23  childhood and recent mental health counseling and has

24  asked for a departure from the sentencing guidelines based

25  on diminished capacity.  Given the record in and his

1    direction and orchestration of a complex scheme to defraud,

2    however, I decline to depart on that basis.  But I must

3    also consider the 3553(a) factors, examining just

4    punishment for the offense, protecting the public from

5    further crimes, the need to promote respect for the law

6    and to afford adequate deterrence.  In this regard, many of

7    defendant's supporters ask for leniency because Mr.

8    Levinson is not a bad person.  He simply made poor decisions,

9    but we actually see relatively few bad people in this court.

10   Most like Mr. Levinson have made poor choices, motivated by a

11   variety of ills.  So Mr. Levinson's situation does not stand

12   out in this regard.

13         All of Mr. Levinson's supporter's have mentioned

14   his family and predict, quite correctly, that they would

15   suffer most if he goes to jail.  That sad outcome is

16   endemic to most criminal cases, as most defendants have

17   families who suffer because their loved one wasn't

18   thinking about them during the criminal activity.  As

19   heartfelt and moving as the submitted remarks are, again,

20   Mr. Levinson's situation does not stand out in this regard.

21         It is important to note, however, that Mr.

22   Levinson's victim was a private business entity, who's

23   principals have resolved their dispute for a sum of money.

24   In other words, Mr. Levinson did not harm the public from

25   a financial point of view.  He was not a public official

31

1   who abused his position of trust, nor was he involved in

2   identity theft, a grave matter of public concern.

3            He was a businessman who stole from his

4   business partners for his own benefit.  He was and remains,

5   however, a person who contributes to the community, his

6   family and friends.

7            In the end, it seems to me that we have an

8   individual who put the appearance of prosperity above his

9   respect for the law.  Balanced against this is the

10  propriety of putting into jail at a substantial cost to

11  the public a nonviolent offender who poses little or no

12  threat to the public and whose crimes had little impact

13  beyond his business partners and his family.

14           I have struggled with this sentence since I

15  got the presentence investigation report.  I have looked

16  back at all of the sentences I have imposed on similarly-

17  situated defendants.  All of those defendants who got

18  jail time ended up going to jail because they impacted

19  the public in some fashion, aside from the mere fact --

20  not the mere fact, aside from breaking the law, they stole

21  from pension funds.  They were people who had positions

22  of public trust.  They used credit cards and stole others'

23  identity.  There was something there that truly was worth

24  punishing.  And when I look at the costs associated with

25  putting someone like Mr. Levinson to jail in this day and

32

1    age compared to the harm he has caused, which has been

2    resolved amicably with his business and which certainly

3    will impose even more harm on his family, I just can't

4    see that it makes any sense.  I just do not.

5         So I reject the advisory guideline range of

6    imprisonment.

7         Now, what I do from there is probably a problem,

8    because I'm not sure, because no one has presented me with

9    an alternate to imprisonment and, quite frankly, I was not

10   sure where we were going here.

11        So, Mr. Lyons --

12        MR. LYONS:  Yes, your Honor.

13        THE COURT:  -- I'm not even confident that I

14   can impose community service at this point.

15        MR. LYONS:  Community --

16        THE COURT:  Community confinement, because I

17   think that is up to the Bureau of Prisons.  I don't think

18   that that is something I can do.

19        MR. LYONS:  I'm not -- well, I can't give you

20   authority while I stand here.

21        THE COURT:  I can't do that.

22        MR. LYONS:  All right.

23        THE COURT:  So I feel quite foolish, quite

24   frankly, because I had come in here deciding that

25   imprisonment makes no sense.  It does not serve a purpose

A-0039

33

1    in this case I don't believe.  And you said you'd be

2    foolish to ask for probation, but that's where I'm left,

3    because there is no middle ground under the sentencing

4    regime any more.

5              So it is the judgment of the Court that the

6    defendant, Adam J. Levinson, is hereby sentenced to

7    serve a term of probation for a period of two years on

8    Count 1 with a concurrent two-year term of probation on

9    Count 4.  As a condition of probation, he shall be placed

10   on home confinement for a period of six months with

11   electronic monitoring, which he shall -- the costs of

12   which he shall pay.  During this period, he shall not be

13   permitted to leave his home except for work and other

14   activities pre-approved by the Probation Office.

15             There are other conditions which I will get

16   to.  But, let me say, Mr. Levinson, that any violation,

17   most people get one bite at the apple, but you do not.

18   Any violation of this probation brought to my attention

19   will result in revocation and a jail sentence.  I hope

20   you realize that.

21             THE DEFENDANT:  I do.

22             THE COURT:  Let me get to the other conditions

23   of probation here.

24             All right.  You shall not commit another

25   federal, state or local crime.  You shall comply with the

A-0040

34

1   standard conditions that have been adopted by this Court

2   and shall comply with the following additional conditions:

3            You shall not illegally possess a controlled

4   substance.  You shall not possess a firearm, ammunition or

5   destructive device.  You shall cooperate in the collection

6   of DNA as directed by the probation officer.

7            You shall participate in a mental health

8   treatment program at the direction of the Probation Office.

9   You shall commit 100 hours of your personal time to

10  community service.  You shall submit your financial

11  records to the Probation Office at the direction of that

12  office.

13           The Court finds that Elkay suffered a loss of

14  $177,289, which is compensable under the Mandatory

15  Restitution Act.  You shall make restitution payments

16  from any wages you may earn.  Well, you shall make

17  restitution payments during the term of your probation.

18          While on probation, you shall pay not less

19  than $250 monthly for restitution.  The Court, however,

20  will waive the requirement for the payment of interest on

21  the restitution.

22          It is further ordered that you shall pay to

23  the United States a special assessment of $200, which

24  shall be due immediately.

25          In light of the restitution obligation, the

35

1    Court finds you do not have the ability to pay a fine and

2    will waive the fine in this case.

3           I think that's what I need to say, except for

4    the fact that you have ten days from the date judgment is

5    entered to appeal this sentence.

6           Have I forgotten something, Mr. Matthews?

7           MR. MATTHEWS:  No, your Honor.

8           MR. LYONS:  No, your Honor.

9           THE COURT:  Ms. Hanson, anything further?

10          MS. HANSON:  No, your Honor.

11          MR. LYONS:  No, your Honor.

12          THE COURT:  All right.  Thank you very much.

13          MR. LYONS:  Thank you.

14          (Court recessed at 5:32 p.m.)

15                        - - -

16

17

18

19

20

21

22

23

24

25